

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-07-389-CR

LESTER WINNINGHAM, JR.                                              APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

------------

### FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION ON PETITIONS FOR DISCRETIONARY REVIEW

------------

Pursuant to rule of appellate procedure 50, we have reconsidered our previous opinion upon reviewing Appellant Lester Winningham, Jr.'s and the State's petitions for discretionary review. *See* Tex. R. App. P. 50. We withdraw our July 1, 2010 opinion and judgment, and we substitute the following primarily to comport with the court of criminal appeals's recent opinion in *Brooks v. State*, which was handed down after our original opinion issued. *See* No. PD-0210-09, 2010 WL 3894613, at *8, *14 (Tex. Crim. App. Oct. 6, 2010).

## I. INTRODUCTION

A jury found Winningham guilty of murder and sentenced him to life imprisonment. The trial court entered judgment accordingly. In two points, Winningham contends that the evidence is legally and factually insufficient to support his conviction. Because we hold that the evidence is sufficient to support Winningham's conviction, we will affirm the trial court's judgment.

## II. BACKGROUND

At roughly 6:30 a.m. on Friday, July 22, 2005, when mechanic Craig Bayer arrived for work in Muenster, Texas, he saw a "heavy column of smoke" drifting into the air in the field behind the shop where he worked. Bayer said that he initially did not "think much of it," believing that the smoke emanated from a truck that someone had started. But as Bayer got closer to his shop, the smoke became more visible. Bayer noticed fire and began to believe that someone was burning trash at the business next door. Bayer described the flames as "six to eight feet tall [with] black smoke coming off of it." He looked for a water hose with the intent of putting the fire out but did not find one. When Bayer came within ten to fifteen feet of the fire, which had died down by then to a few feet high, he became certain it was not trash that was burning. At first, Bayer did not believe what he was seeing. He thought that he was seeing a "mannequin," but then he noticed that the "toenails were painted and [pantyhose were] around the feet" of the body in the fire. Bayer called 9-1-1 and

2

chose not to attempt to extinguish the fire. Roughly five minutes later, the Muenster fire chief arrived. At that time, by Bayer's account, the fire was out.

County officials called Texas Ranger Tracy Murphree to investigate. At trial, Murphree described the scene:

> It was obviously a burned body of a white female, pretty much burnt beyond recognition. It appeared that the body, previously to being burned, was wrapped in some sort of blue tarp. Really unable to determine an age or anything because of the extensive burns. Also there, I saw a receipt from [an] Academy store in Arlington and a plastic bag that appeared to have [once] held a rope. Also noticed that on the receipt, there was a listing for a rope that was purchased on the receipt.

As Murphree said, he found a July 2, 2005 receipt from an Academy Sports store in Arlington, Texas, listing two items: a "10 X 16 POLY TARP" and a "1/4" X 50FT POLYG" rope. Murphree also found a partial footprint and a tire track. Plaster casts were made. Murphree testified that because of the nature of the gravel road and the highly trafficked area where the footprint and tire track were found, there "wouldn't be much to compare [the molds to]." Murphree said that the female body had "a pretty obvious gunshot wound to about the midline section of the back." At that time, Murphree said, the body was still unidentified. The following Tuesday, July 26, 2005, Murphree received a call informing him that, through dental records, the body had been identified as the body of Deborah Houchin.

Assisted by the Arlington Police Department, Murphree went to Houchin's home to further investigate, where he encountered another gruesome scene. The house was disheveled. Murphree saw blood-smeared eyeglasses in the kitchen,

3

blood drops near the home's computer, and a bloodied bullet that had been "spent." Murphree also observed blood smeared "through the kitchen, through the extra living area, through the laundry room, and into the garage." Murphree said, "One of the things that also caught my eye was a -- a drawer was open with a bag of dog food just ripped open in the drawer and a big bowl about half full now that had water in it laying in the kitchen floor." Murphree said that another thing that "first" caught his eye was a path of bleach stains along each step on the stairs. At the end of the path, Murphree found an "eyeglass chain that was laying at the foot of the stairs."

Murphree said that because he concluded there were no signs of forced entry, no valuables missing from the house, signs that the assailant attempted to clean up something with bleach, and what appeared to Murphree as someone who cared about the dogs having fed them before fleeing, he believed this was not a "stranger-on-stranger" murder. Murphree also said that the manner in which Houchin's body was found further solidified his belief that Houchin had been murdered by someone she knew.

Murphree learned that Houchin was a fifty-six-year-old therapist who had lived in Arlington, Texas, and was associated with a group of other therapists who ran a therapy clinic in Arlington. The Wednesday and Thursday after Houchin's body was found, Murphree went to the clinic to interview Houchin's coworkers. He determined that the last time her coworkers had seen Houchin alive was at approximately 11:00 p.m. on Thursday, July 21, 2005. Houchin's coworkers and other investigators

4

informed Murphree that Houchin was not expected to be at work on Friday, the day her body was found. But her absence the following Monday had caused her coworkers to file a missing persons report. Murphree also learned that Houchin and Winningham, in addition to being coworkers, had previously been romantically involved.

Through talking to coworkers, Murphree learned that Houchin and Winningham were once engaged but later broke off their engagement—ostensibly because Houchin had asked Winningham for a prenuptial agreement. Murphree also learned that the couple had what was described as a "yo-yo" relationship where at times they were together and at other times they were not. Based on this information, Murphree said that Winningham was naturally a person he would want to interview regarding Houchin's murder.

Murphree testified that when he and another investigator visited the clinic during their investigation, the other investigator pointed out peculiar markings on Winningham's vehicle:

> My attention was drawn to vertical scratches just to the right side of the license plate. I could see inside those scratches a -- a light blue -- some sort of transfer that was very significant to me [because] the color of the transfer in those scratches was the same color as the tarp that [Houchin] had been wrapped in when her body was burned.

Murphree said that the color was inconsistent with the vehicle's interior and exterior. Murphree had Winningham's vehicle impounded.

5

Murphree said that the interior of the trunk "was pretty [pristine]." By contrast, Murphree said that the interior of the passenger compartment was "[p]retty much in disarray, like somebody had been living in it."

According to Murphree, when investigators conducted a search of Winningham's car, there was "a wad of cash of $13,000," a folded piece of paper with thirteen $100 bills, and another folded piece of paper with three $100 bills. Investigators also discovered a small amount of Houchin's blood and dog hair in the trunk.

Murphree also looked at Winningham's banking and credit card transactions during his investigation. Murphree testified that on July 28, 2005, Winningham withdrew $20,000 cash from his checking account. Winningham also wrote a check to the district court of Tarrant County in the amount investigators recognized as the cost of applying for a passport. Based on this information, Murphree interviewed the administrative passport clerk in Arlington regarding Winningham's application for an expedited passport on July 22, 2005—the same day Houchin's body was discovered. Murphree said that Winningham's credit card statements also confirmed "a charge for $1,089.32 to British Airways."

Murphree said that his team also conducted a search of Winningham's apartment. There investigators discovered a couple of "good size[d] bags" behind a bureau in Winningham's apartment with an Academy logo on them. Murphree testified that a tarp would have fit into one of the bags.

6

Murphree testified that based on the information he gathered during his investigation, his theory of the crime was:

> I know they've been romantically involved. I know from witnesses that even though they'd had fights in the past, this one was particularly vicious and to the point that [Houchin] was inconsolable, in tears. I think that she was beginning to get her life together. She was beginning to try to start seeing other people. I think that she threw that in [Winningham's] face and let him know that she was going on with her life, and I think that he shot her.
>
> . . .
>
> Then I think he drags her body through the house, puts her body in the trunk of his car, and either cleans up then or takes her there, sets her body on fire. And then the next day or two, comes back and cleans up.
>
> . . .
>
> I think [the significance of the tarp and Academy receipt was that he purchased a tarp and then] he wrapped her in the tarp to seal her body and to keep blood and bodily fluids from leaking out. And when he drug her out of the trunk with the tarp, he set her on fire with the tarp wrapped around [her and the blue marks on Winningham's car were the result of] either dragging her in or dragging her out [of the car] or both.
>
> . . .
>
> [And w]hen he finds out I'm coming to talk to him, he immediately cancels all his appointments, withdraws $20,000, and leaves the state. It's my theory he was going to run at that point and, for some reason, decided not to.

Murphree conceded that in addition to withdrawing the $20,000, Winningham also wrote checks to cover his health club membership and electric bill after Houchin was murdered. Murphree also conceded that the check written for the passport was not written on the day Houchin's body was found; rather, the check was written on

7

the following Monday.  But Murphree qualified that he had learned through his investigation that Winningham was told he could not get an expedited passport without an itinerary.  Murphree also testified that Winningham had left a substantial remaining balance in his checking account.

Murphree disclosed that no attempts were made to compare DNA found at Houchin's home to Winningham and that he was unaware if any attempts were made to take fingerprint lifts from the crime scene.  Murphree revealed that he learned during his investigation that Houchin "had plans for the night that she was killed [but] she changed those plans[.]"  In addition to Murphree, a number of Houchin's family members and coworkers testified.  Several investigators and Winningham himself also testified.

### A.    Marlene Wallem

Marlene Wallem, Houchin's sister who lives in Arlington, Washington, testified that Winningham had known Houchin for roughly a year and a half prior to her death.  Wallem said that Houchin met Winningham in June 2003 through an online dating service and that he moved in with Houchin "relatively shortly after they started dating." According to Wallem, Houchin and Winningham traveled to Washington to visit her over the Christmas 2004 holidays.  She said that during the trip, Winningham proposed to Houchin and that Houchin accepted.  Wallem said that a few days after the proposal, she "caught [Houchin] alone, and . . . asked her if she was going to have a prenuptial agreement."  Wallem recalled that Houchin told her

that when she approached Winningham about a prenuptial agreement, he became so angry that he would no longer "touch or kiss her after that." Wallem said that shortly after the couple returned to Texas, the engagement was off.

Wallem testified that Winningham moved out of Houchin's house but later moved back in and that they were not getting married but rather it was "just going to be one day at a time, to see how it went." But she said Houchin again told him to leave and that Winningham moved out. Wallem also testified that it was Houchin who helped Winningham finish school and establish a practice at the clinic where Houchin worked. Wallem said that Houchin believed that Winningham, after their latest breakup, was living in the office, sleeping on a couch at night. Wallem said that Houchin relayed to her that she had confronted Winningham about living in the office and that Winningham had glared at her and stormed out. Houchin, about a month before her murder, told Wallem something that she found frightening: "[Wallem], you know, if anything ever happens to me, make sure the police talk to [Winningham], look at [Winningham]."

Wallem said that after Houchin caught Winningham living in the office, Houchin's dog disappeared in late June 2005. Wallem believed that Winningham had done something to the dog and that after the dog had disappeared, Winningham and Houchin's relationship continued to erode and that the two were "fighting in the office all the time." Wallem said that her sister told her that, "he would act normal in front of everybody else, but when it was the two of them, he would be -- he would

9

just glare at her or say mean things." Wallem testified that Winningham called her the Tuesday after Houchin's body was found and told her he was sorry that Houchin was missing, but that he also asked what the police had determined. Wallem testified that, "And at that time, I -- I didn't want to talk to him anymore. I -- I just felt like he was trying to get information out of me, and I really didn't know anything."

## B.   Dr. Robert Mims

Dr. Robert Mims, a psychiatrist who had been friends with Houchin for over eleven years and worked with both Houchin and Winningham, also testified that Houchin had helped Winningham establish his practice at the clinic. Mims said that he knew of Houchin and Winningham's romantic relationship but was initially surprised that they were engaged. Mims said that because of other commitments, he only worked at the clinic part-time and that Winningham shared his office. Mims testified that he learned the couple were no longer engaged because he asked Winningham about the engagement. According to Mims, Winningham responded that the engagement had ended because of "something to do with Deborah and money, but he was vague." Mims said that Houchin later told him that the engagement dissolved over Houchin's desire to have a prenuptial agreement. He said that the couple's tumultuous relationship created "an air of tension in the office."

Mims said that Houchin and Winningham got into a heated argument at the clinic on the evening of Thursday, July 21, 2005. Mims stated that Winningham wanted the clinic's secretary and part-time receptionist, Teresa Singh, fired and that

10

this was a point of contention between Houchin and Winningham. He said that Winningham was also upset that Mims did not want to form a partnership and that Winningham blamed this on Houchin. By Mims's account, after the argument ended, Houchin was particularly upset.

Mims said that a coworker contacted him on Monday, July 25, 2005, about Houchin's absence from the office. The coworker told Mims that she had tried to contact Houchin all weekend to no avail and that Houchin had not shown up for her Monday morning appointments. Mims recalled that it was at this time that someone from the clinic contacted the police about Houchin.

Mims testified that he came to the office on Tuesday, July 26, 2005, after learning that the police had found Houchin's home in disarray and her dogs unattended. He said that he had also been informed that a body had been found in Muenster. Mims said that while everyone in the office was generally distraught and upset, Winningham's demeanor was appreciably different. Mims also testified that he was unaware of where Winningham lived during the months preceding Houchin's death but that he later learned that Winningham in fact lived in the apartments across the parking lot from the clinic.

### C.    Larry Kish

Larry Kish, an investigator with the Denton County Sheriff's office, testified that he assisted the investigation regarding the discovery of Houchin's body the morning of July 22, 2005. Kish testified about the Academy receipt he and Murphree had

11

collected near the body. Similar to Murphree's account, Kish relayed how the receipt identified the issuing store as being located in Arlington, Texas, with the store's number printed on it. The purchase date on the receipt was July 2, 2005, and two purchased items were listed—a tarp and a rope. Packaging for a rope was also found near the body. Kish said that these two items were processed but that no fingerprints were found. Kish also said that Houchin's body had been burned along with a blue tarp. Kish said that what looked to be a footprint was found near Houchin's body. Kish said that he took a cast of the possible print but that "it was very vague." Kish admitted that no one compared the print to anyone's shoes. Kish said he took a cast of what appeared to be a tire print, but that casting was also never compared to anyone's vehicle, including Winningham's car.

Kish said that when he visited the clinic, he was able to observe Winningham's vehicle in the parking lot. According to Kish:

> On the rear of the vehicle, I did a visual inspection of the vehicle, walked around it. And on the bumper, the back of the bumper, the passenger side of the bumper, there [were] some scratches on it, and there [were] some blue fibers actually imbedded into the plastic part of the bumper.

### D.    Dr. Jill Ervin

Dr. Jill Ervin, a medical examiner at the office of the Dallas County Medical Examiner in the Southwestern Institute of Forensic Sciences in Dallas County, testified that Houchin's body was identified through dental records after she examined it. She said that Houchin's body had "almost 100 percent burns over the

12

entire surface of the body." In addition to charred fragments of clothing and jewelry on the body, Ervin said that there was also "some molten blue material that was consistent with a tarp." She also stated that the clothing fragments consisted of a "charred bra on her body" and "charred stockings on her right foot and leg."

According to Ervin, x-rays revealed a bullet in Houchin's corpse. Ervin said she found evidence of three different gunshot wounds on the body—two in the lower back and one in the back of the right ribcage. Ervin opined that the bullet to the ribcage caused a fatal wound and that Houchin would have died within a half-hour of the infliction of the wound. Ervin said that Houchin was not alive at the time she was set on fire. She also testified that in order to burn a human body, a source of fuel would be necessary.

### E.    Bruce Tinch

Bruce Tinch, owner of the building that housed the clinic and husband of one of the clinic's counselors—Amy Tinch[1]—testified at trial. Tinch said that his wife and Houchin were friends and that they had known each other roughly twenty-five years. Tinch met Winningham through Houchin. By Tinch's account, Houchin had brought Winningham into the clinic's practice and "introduced him into the business part." Tinch said he watched Houchin and Winningham's relationship evolve from an "elation, idyllic form into basically a train wreck catastrophe." He said that during the

---

[1] The record does not indicate why, but neither the State nor Winningham called Amy Tinch to testify at trial.

months leading up to Houchin's death, there were several "public arguments, public feuding, anger." Tinch testified that the point in time that the relationship went from "joy of an engagement . . . into a tailspin" occurred after Houchin requested a prenuptial agreement. According to Tinch, the fighting was so bad that "the police were called to [the] office one day to break up a fight."

Tinch explained that one night in February 2005, when his wife Amy was in bed sick, Houchin unexpectedly arrived at his house pounding on the door. He said she had the look of "disheveled frightened terror." He said that Houchin told him, "I know Amy's sick. I just got to come over. We've got to talk. We've just got to talk." Tinch described how he tried to calm Houchin down and how she said things like "[Winningham] isn't the person that we thought he was" and "I need you to know -- I need someone to know that if anything ever happens to me, it's [Winningham]." Tinch said that Houchin explained that while she had a lot of money, Winningham had none. Houchin showed him paperwork that she had brought with her indicating that Winningham had borrowed money without paying it back. He also said that Houchin said, "'I think he's trying to get my money'" and she referred to the prenuptial agreement. Tinch said that Houchin relayed that the prenuptial agreement was a key issue in the decline of their relationship. Tinch explained that Houchin said she had kicked Winningham out of her house, changed the locks, and acquired a gun. Tinch suggested to her that they go to the police, but she allegedly replied, "No, I can take care of myself."

14

Tinch explained how, after the breakup, Houchin had resumed Internet dating and had gone around the office "touting it around . . . that she had 400 hits." Tinch said that "someone said that [Winningham] had gotten very angry about that."

Tinch also described how on Monday, July 25, 2005, his wife had called him several times, worried that Houchin had not arrived for work. Compelled by her insistence, Tinch said that he went to check Houchin's house and that the police were already there performing a welfare check. At the request of the police, Tinch agreed to care for Houchin's dogs. Tinch also described what happened at the office on Tuesday, July 26, 2005. He said that a group gathered at the office and "everyone shared the same sentiment except one, and that was [Winningham]." Tinch said that while everyone else was "tense [and] anxious," Winningham was emotionless.

Tinch also said that on Wednesday, July 27, 2005, Winningham had an odd conversation with him. Tinch recalled that Winningham was making statements like, "You know . . . I'm over her" and, "She's been calling me, and I'm over her. . . . I found somebody else, and I'm not interested . . . in her anymore." Tinch said that Winningham appeared defensive about his relationship with Houchin and also said, "[Houchin] was so proud that she had gotten 400 hits on the new dating service . . . I don't care about her." Tinch said that Winningham struck him as "hugely, horrificly odd" when he told him that he had called Houchin's sister over the weekend and told her that Houchin had been murdered. Tinch said that this specifically caught his

15

attention because they did not know Houchin had been murdered until Tuesday and Winningham specifically said he had called Houchin's sister over the weekend. Tinch averred that the conversation alarmed him enough that he informed one of the Texas Rangers what Winningham had said.

Tinch said that Winningham's behavior was so odd that he asked Winningham to leave the clinic. Tinch testified that Winningham wore shorts when he removed his things from the office a couple of weeks later, and Tinch noticed that Winningham had what appeared to be fresh wounds on his shin as though a "scab had been taken off."

Tinch also recalled that prior to Houchin's murder, he had approached Winningham about where he lived because Houchin had informed him that Winningham might be living in the office. Tinch said that Winningham told him he was living in Grand Prairie but that he learned later from investigators that Winningham lived in the apartment "over the fence from the office." Tinch said that despite being only "40 seconds" from the office, Winningham would still drive his car to work. Tinch testified that it was very clear to him that Winningham did not want anyone to know where he lived.

### F. Alisa Sample

Alisa Sample, who did insurance billing, testified that she had worked with Houchin for a number of years. Specifically, Sample had handled billing statements for Houchin for the two years prior to her murder and for Winningham since

16

sometime in 2004. Sample averred that she had a very good rapport with Winningham. Sample, who worked mostly from home, said that Houchin's normal routine was to fax her Thursday "day sheets" to Sample on Sundays because Houchin did not work on Fridays. According to Sample, Winningham sent his day sheets each night.

Sample said that Winningham was prompt and routine about his billing because it was very important to him. Sample testified that the first time Winningham failed to submit his day sheets to her was the evening of Thursday, July 21, 2005—the night before Houchin's body was found in Muenster. Sample said she called Winningham on his cell phone that night somewhere between 10:30 p.m. and 11 p.m. She said she left a message but that Winningham did not return her call that night. Sample said that Winningham contacted her on Friday to inform her that he would be faxing his day sheets for both Thursday and Friday but that he did not send them to her until Sunday. She said that this was very unusual. Sample also averred that Winningham told her on Sunday he had seen a patient on Saturday and that she should bill out on that patient. Sample said that this too was unusual because Winningham did not routinely see patients on Saturdays.

Like others in the clinic, Sample testified that between the time Houchin was thought to be missing and the time her body was identified, everyone else in the clinic was "trying to sort things out and figure things out" but that Winningham was

17

not participating.  Sample said that his not participating struck her as odd.  Sample testified that she found one particular exchange with Winningham chilling:

> After I spoke with the morgue and I hung up the phone and told Amy Tinch that we needed to get the dental records, I came forward to [Winningham] and told him that they thought [Houchin] had been murdered.  And at that time, he stood right beside me, and he asked how we figured this -- you know, how did we come about this.  And his expression was, oh, that's -- that's horrible, how would you find that out.  And that's when I went on to tell him that I felt like doors were opening up, and I was --  you know, one question to another, asked another one, and led to one phone call and the next phone call and the next phone call.  And he made the comment to me as he was leaving, he was just real -- just stood there like in shock basically, and you could see the expression on his face, and that's when he tapped on my shoulder, because [Winningham] and I have always worked well together and said, 'Well, aren't you a real smart one.'

Sample recalled that after the Arlington Police Department came to the office, Winningham's behavior concerning his appointments became unusual and erratic: "He blocked off times, took off, canceled patients . . . just [said,] 'I'm leaving.  I'll be back.' . . . [a]nd he was all day long marking out [appointments] . . . That wasn't like [Winningham] at all."  She described his behavior as "very unusual."  Sample was also surprised to learn where Winningham lived.  She said that no one knew he lived so close because "he drove his car like normal to work as if he lived somewhere else."

## G.    Teresa Singh

Teresa Singh, who worked with Houchin for more than fourteen years and served as the clinic's manager and insurance verifier, testified that the general mood

18

at the clinic on the Monday and Tuesday after Houchin disappeared was one of confusion. She also testified that she had visited Houchin's home the weekend before she was murdered and that she had witnessed the stairs to the second story and there was nothing unusual about the carpet on the stairs at that time. Singh said that Houchin had told her that she was expecting a call the Thursday night before her body was found. Singh stated that she did not remember the individual's name but that it was not Winningham.

### H. Gwen James

Gwen James testified that she started working as one of the clinic's receptionists roughly three months before Houchin's murder. One of her primary duties was to keep Winningham's schedule. She said that Winningham was often "pretty much booked solid" and that he normally saw his first patient at 8:15 a.m. Initially, James testified that Winningham called her at approximately 8:15 a.m. on Friday, July 22, 2005—the morning Houchin's body was found—to inform her that he would be late. James testified that Winningham had an 8:15 a.m. appointment that morning and that he ultimately arrived "just a few minutes late." But after reviewing Winningham's appointment book, James altered her testimony and said that Winningham called her at 8:30 a.m. on Friday to inform her that he would be late and that Winningham was in fact "on time for his [9:15 a.m.] appointment."

Defense counsel asked James when Winningham's "usual" time to arrive in the mornings was. James said that he would usually arrive by 8:15 a.m. Citing her

19

statement to investigators, defense counsel asked whether she had reported to the police that Winningham had arrived at his usual time. James answered in the affirmative. But when defense counsel asked James to clarify, she again said that Winningham called her between 8:15 a.m. and 8:30 a.m. Friday morning to inform her he would be late and that he arrived sometime between 9:10 a.m. and 9:20 a.m. James admitted that she never mentioned Winningham's alleged Friday-morning phone call to investigators.

James testified that on the following Monday, Winningham called her again and asked her to reschedule his morning appointments because he had errands to run. She said that the phone call was unusual because it was made to her cell phone, she had already been in the office for thirty minutes, Winningham normally kept his appointments, and he had never called her cell phone before. She testified that during the week after Houchin's murder, it became routine for Winningham to cancel or reschedule appointments. James recalled that after Winningham had been asked to leave the clinic, he came to pick up mail and told her that he knew he was a suspect in Houchin's murder.

### I.    Byron Stewart

Detective Byron Stewart of the Arlington Police Department's homicide unit testified that after Houchin was reported missing, he assisted during a welfare check of Houchin's home. Stewart described Houchin's home:

The house was in a state of disarray, in my opinion, as far as couch pillows thrown on the floor, clothing on the floor. It appeared that dogs had urinated and defecated throughout the house. I did see a purse along with a cell phone and keys and a wallet with credit cards in it on the kitchen table. It was -- there was a chewed-up shoe, woman's shoe, on the floor, things of that nature.

Stewart explained that because he was performing a missing person's welfare check, he was initially focused on finding Houchin. He said that he remained in the house for roughly ten to fifteen minutes, surveying the house, looking for indications of Houchin's whereabouts. During his search, Stewart noticed a computer running. He said that he touched the spacebar and the computer displayed an internet dating site. According to Stewart, as he left the home, Tinch arrived and explained that he believed that Houchin's body had been discovered. Stewart said, "[s]o we locked up the house, and we followed [Tinch] to [the clinic], and that's when we met with the entire . . . staff at this particular location."

While there, Stewart learned that Winningham was not at the meeting. Stewart also learned that Winningham and Houchin had previously had a romantic relationship and that their breakup had caused tension in the office. Stewart said he asked someone to have Winningham come to the meeting. By this time, Stewart had learned the gruesome details regarding the state of Houchin's body. He said that he purposely explained the body in "somewhat graphic [detail] because [he] wanted to see kind of the reaction [he] was going to get from everyone in the room . . . they all kind of gasped, you know, and started showing emotions, but [he]

21

purposefully looked at [Winningham], and he showed no emotion at that time." Stewart explained that based on his experiences speaking with "family members, loved ones, fiances, ex and present [about murder victims]," Winningham's behavior was "not typical of a person who probably just got the news that his former fiancee was found murdered." Stewart said that he then gave his business card to Winningham, "I made a point to point out my e-mail to him and my numbers to him, and I also made a point to told -- asked him to call me if he needed anything from me at all."

Stewart said that Winningham did in fact e-mail and inform Stewart that he would be traveling to Germany. The e-mail explained that Winningham would be leaving on August 9, 2005, and returning August 16, 2005. Stewart averred that Winningham's e-mail was odd because "he had no emotions and didn't offer to help in any kind of way when" he had previously explained at the clinic that the body found in Muenster was believed to be Houchin's. Stewart said that after reading Winningham's e-mail, he believed Winningham was going to flee the country but that he agreed that Winningham was free to travel abroad because there was not an existing warrant for his arrest.

### J. Cary Treff

Cary Treff, Houchin's brother who lives in California, testified at trial as well. Treff said that he had initially been informed by Amy Tinch that Houchin did not come to work on Monday. Later, Tinch informed Treff that it was Houchin's body

22

that was found in Muenster. Although Treff knew of Winningham, he testified that the first time he met him in person was when he traveled to Arlington after Houchin's body was found. Treff said that he met Winningham at the clinic—where Treff had gone to meet up with Bruce Tinch. Winningham gave Treff his business card and said to call him if he ever "wanted to talk about [Houchin]." After Treff and Winningham had both attended Houchin's memorial service, Treff said that the two had arranged to meet the next day in Winningham's office because Treff "felt a desire to talk to him before [Treff] left town."

According to Treff, after making small talk, Treff asked Winningham, "if he had any idea who could have killed [his] sister?" Treff said that Winningham then "completely lost his composure." Treff recalled that "He could not look me in the eyes anymore. He was looking down and sideways . . . He stumbled with his words." Treff confronted Winningham about him not wanting to talk to the police without an attorney: "I asked him, 'Why? Why won't you talk to the police? Everybody else has in this clinic.'" Allegedly, Winningham responded, "Well, under these circumstances, I think it's appropriate that I have an attorney." Treff pressed further asking, "What circumstances?" Then Treff said he directly asked Winningham, "[D]id you kill my sister, [Houchin]?" And Winningham's response was only that he had "dated her" but was not that he had loved her, been engaged to her, and lived with her. Treff testified that the conversation left him with a definite impression:

I knew he was a witness or a potential candidate that could have done this, but based on him losing his composure to my question of do you know who could have done this, I believed he did it at that point. I believed he was the person that killed my sister.

### K.     Brent Chambers

Brent Chambers, an FBI special agent and crime scene investigator, testified that he assisted the Texas Rangers' investigation; specifically, Chambers led the team responsible for collecting evidence at Houchin's home after it was determined she had been murdered. After giving a basic description of Houchin's house, including its layout, Chambers testified about the condition of Houchin's house. According to Chambers, blood and bleach stains indicated that Houchin's body was dragged from the upstairs office, down the stairs, through the kitchen, and into the garage.

Chambers found bloodied eyeglasses in the living room. He also found an eyeglass chain at the bottom of the stairs. In the office near the computer, Chambers found a "spent round, a bullet, [with] what appeared to have blood on it, on the floor." In the bedroom, Chambers found a .357 revolver in the nightstand.

On cross-examination, Chambers testified that there was a broken window that had been boarded up in one of the rooms and that was not the result of either the investigation or the welfare check. Chambers also testified that a cigarette butt and beer can were found near the garage of Houchin's house and collected as evidence. Although Chambers testified that they were collected because "[they

m]ight have evidentiary value," he did not elaborate on whatever became of these items.

### L.   Jamie Becker

Jamie Becker, a firearms and tool mark examiner for the Tarrant County Medical Examiner's Office, testified that she examined both bullets found during the investigation—the one found in Houchin's body and the one found in the office of [Houchin's] home.  Becker said that both bullets were fired from the same gun, a ".38-caliber class" weapon.  Becker said, however, that the bullets were not fired from the gun found in Houchin's home.

### M.   Monica Seagate

Monica Seagate, an FBI special agent and crime scene investigator, testified that she conducted the investigation of Winningham's apartment.  Seagate said that she found an Academy bag "kind of balled up and pushed down towards the floor behind [Winningham's] armoire and the wall."  Inside the bag, Seagate found another torn Academy bag containing rope.  When asked why she collected these items, Seagate said, "Anytime you find rope wrapped up and hidden in a bag behind an armoire, between the wall and a dresser smashed down to the floor, it's a little bit suspicious."  She also said that she collected a pair of Winningham's shoes.

### N.   Michael Hillman

FBI special agent Michael Hillman testified that he forensically processed Winningham's car.  During processing, Hillman took photographs of Winningham's

car which were introduced into evidence. He specifically testified about scratches found on the back bumper and "blue filament" lifted from the grooves of the scratches. Hillman also said that there was a contrast between the condition of the interior of the car and the interior of the trunk.

By Hillman's account, "When you compare the condition of the trunk to the condition of the passenger compartment, the trunk was very clean. The passenger compartment was disheveled, had a lot of personal articles scattered throughout." Hillman described that there were two trunk liners—a permanent liner and a removal plastic liner that lies on top of the permanent-cloth liner. Regarding the removable liner, Hillman said that it was "a plastic kind of drop mat that you can buy – sometimes cars come with it; sometimes it's an aftermarket product -- that you can put into the car. And if you spill a plant or if you're transporting potting soil back there, it kind of pops out, easier to clean the interior of the trunk." Hillman testified about a portion of the cloth liner that had "a presumptive hit for blood" on it. He sent the liners for further testing. Hillman found a flashlight and plastic bag containing a funnel in the trunk. He also found a plastic packaging for gloves in the passenger floorboard, $1600, and a folder containing passport information.

### O.    Carolyn Van Winkle

Carolyn Van Winkle, a forensic scientist for the Tarrant County Medical Examiner's Office, testified that she analyzed some of the items found in Winningham's car. Specifically, Van Winkle testified about blood stains found in

26

Winningham's trunk. In addition to a number of identified "weak[]" blood stains, Van Winkle said that there was a small distinct stain of blood—approximately .5 centimeters in diameter—found on the outer cloth liner of the trunk. She said that the blood had "actually soaked through to the other side" of the outer cloth liner. After comparing the DNA profile from the distinct stain of blood found in Winningham's trunk to the DNA profile from a known sample of Houchin's blood, Van Winkle testified that the two were "certainly consistent" with each other and that the blood in the trunk tested positive for Houchin's blood. According to Van Winkle, the blood from Winningham's trunk "was the same as [Houchin's] profile" "at all the different 13 locations" for verifying DNA consistency. Van Winkle said that there was no way to determine how long the blood had been in the trunk, but because it had soaked through the liner, she averred that the blood was in liquid form when it was exposed to the trunk's interior. Furthermore, Van Winkle said that because DNA material begins to immediately degrade once it is left, the blood would not have been years old; at most, it could have possibly been months old.

Van Winkle also testified to the biological material found on the bullet recovered from Houchin's home. Van Winkle said that "barring any identical sibling contributor," the biological material found on the bullet came from Houchin.

**P.      Stephanie Parrot**

Stephanie Parrot, an administrative passport clerk for the Tarrant County District Clerk's Office, testified that during July 2005 she was working in the Arlington

27

subcourthouse verifying passport applicants' documentation. She said that normally a passport application takes six weeks to process but that applicants can expedite the process and receive their passports in as little as two weeks. Parrot recalled that Winningham came in to apply for an expedited passport on Friday, July 22, 2005. She remembered Winningham specifically because he came in "very late in the day, and I only remember that because we close at 4:30, and I was ready to leave for the day when he came in." She also remembered that although Winningham wanted "to leave in less than 14 days," he did not have "proof that he needed to leave the country" so quickly. In sum, Parrot testified that she did not process Winningham's request for a passport because he "didn't have everything he needed on that day." She said that Winningham returned on Tuesday, July 26, 2005, still wanting an expedited passport, but that this time he had proper documentation. When Winningham returned with an itinerary, Winningham filled out an application. According to the application, Winningham wanted to travel to Germany, Italy, and Switzerland, leaving August 9, 2005. Parrot identified Winningham, as he sat in the courtroom, as the person who came in on both Friday, July 22, 2005, and Tuesday, July 26, 2005.

### Q. Brad Harmon

Texas Ranger Brad Harmon testified that he was called in to investigate when Houchin's body was found but not yet identified. Specifically, he investigated the Academy receipt. Harmon testified that the information from the receipt led him to

28

an Academy sporting goods store located within ten miles of the clinic and Winningham's apartment. Because the store did not have surveillance cameras and because the clerk who had handled the transaction regarding the receipt did not remember the transaction, Harmon was unable to initially place Winningham at the Academy store.

During the investigation, Harmon accompanied Murphree and Kish during their initial visit to the clinic. Harmon said that while outside the clinic, Kish pointed out the scratches with blue material located on Winningham's bumper. Harmon described the scratches as vertical and containing "blue transfer material."

Based on his knowledge of the blue tarp found on Houchin's body and the blue material found on Winningham's car, Harmon purchased a blue tarp from the Academy store in Arlington. Consistent with the Academy receipt, the tarp Harmon purchased was ten-by-sixteen feet. Harmon testified that the size of the tarp would have allowed a person to wrap Houchin's body inside it after she was shot and killed. With Harmon's assistance, the State demonstrated that the tarp fit within the Academy bag that investigators found behind Winningham's armoire. On cross-examination, Harmon admitted that, other than that found on the bumper, no remnants of anything resembling a blue tarp were found in Houchin's home or anywhere else in Winningham's car.

Harmon said that Winningham, through his attorney, contacted him on August 3, 2005, about meeting and discussing Houchin's case. Harmon testified that they

29

obtained a search warrant for Winningham's car while en route to the attorney's office. During their interview, Harmon observed Winningham and said that when he was asked about Academy, a tarp, and rope, Winningham "was surprised, kind of shocked. A -- you could see a definite change in his demeanor." Harmon found Winningham's reaction significant. After being questioned about Academy, Winningham admitted that he had been to the Academy store that Harmon had investigated. When asked what he had purchased, Winningham said he had purchased socks.

Harmon also said that prior to Houchin's funeral, investigators were able to use cellular technology to trace Winningham's cell phone. They learned that Winningham had traveled to New Mexico after investigators initially visited the clinic but that he had returned for Houchin's funeral.

### R.   Patricia Eddings

Patricia Eddings, senior trace analyst for the Tarrant County Medical Examiners' crime lab, testified that she compared the blue material lifted from Winningham's bumper with a control tarp and debris from the tarp that was burned around Houchin's body. When asked to describe the materials lifted from Winningham's bumper, Eddings referred to them as "smears." When asked why she referred to them this way she said:

> Well, I think that more accurately depicts what it does look like. It looks like a material that had some force behind it that actually impacted the surface of this bumper and then went across the area in a linear

30

direction. It's not like -- because all -- all of [the transfers], as you look at them, are more heavily concentrated kind of toward the center, like it didn't have as much force at first, but then the middle point is where the greatest point of impact was, transferring most material, then it was coming off with lesser material on the edges.

Eddings said that she performed visual, microscopic, and spectrometry examinations of the material found in the lifts taken from Winningham's bumper. Eddings concluded that the material from the lifts was the same material and color and had the same spectral patterns as the control tarp and the debris found on Houchin's body. She also stated that the control tarp and debris had "the [same] ability to form a film when force is applied to them" and smeared upon a surface as the material found in the lifts. Eddings admitted that "this [was] the first time [she] had done a comparison with this type of plastic on the back of a car" during her over thirty years of experience. And Eddings also said that she was unaware of the amount of force that would be required to smear the tarp material onto a car's bumper. Eddings said that her office had determined that the rope found on Houchin's body and the rope found in Winningham's apartment were not the same rope. She also testifed that some of the hair found in Winningham's trunk was dog hair and the other hair was brown body hair of Caucasian origin.

### S.    Steve Stockdale

Steve Stockdale testified for the defense. Stockdale said that he participated in online dating and that he had exchanged e-mails with Houchin. According to

31

Stockdale, he and Houchin had two brief phone conversations—one of which occurred on July 21, 2005.

**T.    George Baab**

The defense also called George Baab, another witness who had met Houchin through online dating. Baab said that he and Houchin originally had planned to meet in person for the first time the evening of Friday, July 22, 2005, but Houchin called on July 21 during the day and canceled stating, "There's something I thought I had cleared up, but it's not, and we'll have to postpone and reschedule." She asked him to call her again over the weekend to reschedule. Baab said that he tried to call her on the weekend but could not get in touch with her.

**U.    Amy Jaggers**

Amy Jaggers testified that she met Winningham on an Internet dating site in June 2003. Jaggers declined to categorize her relationship with Winningham as dating but said that in addition to eating out and "just visit[ing] in [her] home or at a restaurant or something," she also took the opportunity to learn from Winningham and help him score psychological tests. She recalled that Winningham called her just after midnight of July 22, 2005, for a brief phone conversation. She said she did not know where he was, but he told her that he had just been running—an activity she said he enjoyed.

Jaggers said that she traveled to Munich, Germany, on August 9, 2005, to see her brother, who had given her and her daughter tickets. According to Jaggers, she

had planned to go since Christmas 2004 and told Winningham of her plans in January 2005. She said that she invited Winningham to join them. Jaggers invited Winningham again in May 2005, but Winningham said he was unsure if he could go. She said that Winningham did not make arrangements initially, but then, on Saturday, July 23, 2005—the Saturday after Houchin was murdered—Winningham saw her passport and asked when she was going. After informing him again that she was going August 9, she again asked if he wanted to go along, and he said, "Well, I don't know. I doubt that I can get tickets this late." She said that they started looking for tickets Saturday night. Jaggers said that she asked whether his passport was current and that it was then that Winningham indicated he was going to have to get his passport renewed.

### V. Sonny Brownlee

Sonny Brownlee, a private investigator for the defense, testified that he met with Craig Bayer where Bayer had found Houchin's body in Muenster. Brownlee testified that when he returned, he drove from that location to the clinic in Arlington. He drove the same route again on a Friday morning and left at 6:30 a.m.—roughly the same time of day Bayer discovered Houchin's body. Brownlee said that while driving the speed limit, the trip took him one hour forty-five minutes and that the distance between where Houchin's body was found and the clinic was ninety miles. Brownlee also said that he was aware that Winningham's first appointment on Friday, July 22, 2005, was scheduled for 9:15 a.m.

33

**W.    Lester Winningham, Jr.**

Winningham testified at trial.  He acknowledged that he and Houchin had been engaged but stated that he did not kill her.  He told how he and Houchin had met through an online dating service.  According to Winningham, after the two had dated, he moved in with her.  And he stated that after living together for roughly nine months, he proposed to her at her sister's house in Washington over Christmas.  Winningham said that during the time he lived with Houchin, he had moved out three times before ultimately moving out for good on April 15, 2005.  Winningham said that he was not bothered by Houchin's request for a prenuptial agreement; rather, the relationship ended because of "conflicts we had at the office."

Although claiming that he did not owe her money, Winningham said he did write checks to Houchin to help her with her mortgage—specifically citing a check written to her for over $1,000 in early July.  But he later testified that he was mistaken about why he had written her the check and that it was in fact for business expenses.  He said that even though he saw her a lot at work, he didn't have much contact with Houchin outside of work after their final breakup on April 15.

Winningham explained that the reason others did not know where he lived was intentional because Houchin "and I were having a lot of problems.  I felt like it was best that she [and the others] not know where I lived, because I felt like she would initiate contact . . . that she might stop by, and I was -- I didn't want that to happen."  Winningham said that he did have an argument with Houchin on July 21,

34

2005, over staff-related matters. He testified that after the argument, he drove back to his apartment. Two hours later, Winningham called Amy Jaggers because he had "some tests that needed to be scored. I was getting behind. She had helped me before."

Winningham said that he first learned of Houchin's disappearance the Monday following her murder—July 25, 2005. By Winningham's account, no one was concerned on Friday that Houchin might be missing because she did not work Fridays. His testimony was that even though his first appointment was set for 9:15 a.m. on Friday, July 22, 2005, he arrived for work "about 8:10 or 8:15." Winningham denied ever going to the passport office that Friday. After his appointment book and progress notes were admitted into evidence, Winningham testified that he could not have been at the passport office because he had a 4:15 p.m. appointment on Friday, July 22, and he took progress notes of the patient he counseled. He explained that he had gone to the passport office twice on Tuesday because he lacked his itinerary, and that Parrot "was just a little confused." When pressed by the prosecutor to explain at what times he went on Tuesday, he could not remember exact times but said that he "went to [his] apartment and got the itinerary . . . and then went back." Winningham admitted that his appointment book did not always reflect reality, because even though his appointment book indicated he had a confirmed appointment for July 28, 2005, at 9:15 a.m., he was in fact withdrawing $20,000 cash from his checking account at about that time on that date.

35

Winningham also disputed testimony that he called Houchin's sister over the weekend before authorities had learned that it was Houchin's body found in Muenster. Winningham testified that his phone records—admitted into evidence—demonstrated that he made a call to Houchin's sister on Tuesday, July 26, but that no calls had been made to her previously. Again referring to his cell phone records, Winningham said that he also never called the clinic on Friday morning to inform the receptionist he would be late. Winningham's phone records corroborated his testimony.

Winningham said that he planned to travel to Germany in August 2005 and purchased his ticket on Sunday, July 24, 2005. But he said that he did not apply for a passport until the Monday after he purchased his ticket. He said that he informed investigators about his intention to travel as a "courtesy" in case they wanted to talk to him. When asked whether he took the trip to Germany, Winningham said, "Well, I had decided that since I had been arrested, probably wouldn't be a good idea to go to Germany."

Winningham explained his reasoning for securing an attorney before he was arrested:

> Well, I felt that under the circumstances, I -- [Houchin] was -- had been murdered. I knew that I had a previous relationship with her, I knew that we were having conflict in the office, and I knew that I was in my apartment that Thursday night, the 21st. I was by myself. And I thought it would be a good idea, before I talked to the police, that I get an attorney.

36

Pertaining to his large cash withdrawal, Winningham said that he took $20,000 cash out of his account to obtain a lawyer. Winningham told how he joined a fitness club on July 23, 2005, and even wrote a check for membership fees. He also recalled that he wrote checks for his electric bill, fees for a birth certificate, and credit union fees after Houchin had been murdered. Winningham testified that the birth certificate was obtained in relation to his pursuit of a passport. Winningham's explanation for why he withdrew cash for an attorney, as opposed to writing a check like he did for the other expenses, was, "I didn't know if [an attorney would] take a check [or] if they wanted cash. I don't know how lawyers work in murder cases."

According to Winningham, he traveled to New Mexico by himself because he felt the need to get away. He said he returned when he learned when Houchin's funeral would be held. Winningham said that he had no idea how Houchin's blood got into his trunk or how the blue material made its way onto his bumper. Winningham admitted that Houchin's dogs had previously taken rides in his car, but he denied they were ever in the trunk. He said that he never saw blue material or scratches on his bumper and testified that he had filed a sworn statement that Texas Ranger Murphree and investigator Kish's observations of the alleged material were "blatantly false." Winningham said that he canceled appointments in the days following Houchin's murder because he was shocked and could not concentrate after learning what had happened.

37

Winningham also discussed e-mails Houchin sent him where she indicated that she was sorry about their tumultuous relationship and that she wanted things to be calm between them. In the e-mails, Houchin expressed that she wanted to see him and was willing to have an intimate relationship without commitment. Winningham said he told her he was in another relationship.

After closing arguments, the jury deliberated for approximately four hours and then returned a verdict of guilty. A punishment trial followed, and the trial court sentenced Winningham to life imprisonment. This appeal followed.

## III. DISCUSSION

In two points, Winningham challenges the legal and factual sufficiency of the evidence to support the jury's verdict that he murdered Houchin. A person is guilty of murder if he (1) intentionally or knowingly causes the death of another, or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See* Tex. Pen. Code Ann. § 19.02 (Vernon 2003). The court of criminal appeals recently held that there is "no meaningful distinction between the *Jackson v. Virginia* legal-sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson v. Virginia* standard is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. All other cases to the contrary, including *Clewis*, are overruled." *Brooks*, No. PD-0210-09, 2010 WL 3894613, at *8,

38

*14. Accordingly, we will apply the same standard of review to both of Winningham's sufficiency complaints.

### A.    Standard of Review

In reviewing the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.  The trier of fact is the sole judge of the weight and credibility of the evidence.  *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009).  Thus, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.  *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000).  Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict."  *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).  We must presume that the factfinder resolved any conflicting inferences in

39

favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Hardy v. State*, 281 S.W.3d 414, 421 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); *Malik*, 953 S.W.2d at 240. We may not, however, affirm a conviction based on legal or factual grounds that were not submitted to the jury. *Malik*, 953 S.W.2d at 238 n.3. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

## B. The Evidence is Sufficient to Support Winningham's Conviction

Viewing the evidence in the light most favorable to the verdict, the record demonstrates that Houchin was killed in her home office—medical examiners

40

testified that the bullet found in Houchin's home office contained Houchin's DNA, and x-rays revealed a bullet lodged in Houchin's body; additionally, a firearm expert testified that both bullets were fired from the same gun. From there, Houchin was dragged down the stairs, through the kitchen, and into the garage. Then, Houchin's body—wrapped in a tarp—was transported to Muenster where her body and the tarp were purposely burned. The State provided evidence that the inside of Winningham's trunk contained dog hair, human hair, and Houchin's blood. Blue material was smeared into scratch-like grooves of Winningham's bumper—indicating that a blue object forcefully contacted the bumper. Also, the interior of Winningham's car was in disarray, in contrast to the pristine condition of his trunk. The jury could have reasonably inferred that Houchin's body was once in Winningham's trunk, wrapped in a blue tarp, and that the blue smear marks were caused by her body being placed in or pulled out of his trunk. The jury could have also inferred that Winningham cleaned his trunk to hide evidence that he disposed of Houchin's body after placing her in his trunk. The record also demonstrates that Houchin was murdered after a tumultuous relationship with Winningham and shortly after a heated public feud. Testimony at trial indicated that Winningham was particularly upset with Houchin about both their work and private relationships. A receipt from an Academy sporting goods store was found near Houchin's remains, tying the tarp that her body was placed in to an Academy store in Arlington. Winningham lived within ten miles of the store where the tarp was purchased.

41

Out of his normal routine, Winningham failed to submit his pay sheets to the clinic's insurance billing assistant the night Houchin was murdered; and he called the clinic's receptionist on Friday morning, informing her that he would be late. The jury could have reasonably inferred that Winningham's varied conduct on the night of Houchin's murder and the day following meant that he had murdered Houchin the night before and was driving back from Muenster after disposing of her body Friday morning.

After Houchin was murdered, Winningham attempted to obtain an expedited passport before anyone at the clinic knew Houchin was missing. After being denied a passport because he lacked an itinerary, Winningham decided that he would accompany Jaggers during her travels to Germany—despite having twice-previously declined to accompany her. After buying tickets, he returned, itinerary in hand, and again attempted to obtain an expedited passport. Winningham also withdrew a large amount of cash shortly after Houchin was murdered. The jury could have reasonably inferred that Winningham was planning to flee the country even before Houchin's coworkers knew she had disappeared. *See Gosch v. State*, 829 S.W.2d 775, 783 (Tex. Crim. App. 1991) (holding that evidence of withdrawing cash with intent to flee country probative of intent to murder), *cert. denied*, 509 U.S. 922 (1993). The jury could have further determined that Winningham demonstrated a consciousness of guilt and that he was lying when he testified that he did not call the office the morning of Houchin's murder and did not attempt to obtain a passport that

42

same Friday, when other witnesses testified to the contrary. *See Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1999, pet ref'd) (reasoning that a jury can infer that a defendant demonstrated a "consciousness of guilt" by lying about events surrounding the alleged crime); *see also Wright v. West*, 505 U.S. 277, 296, 112 S. Ct. 2482, 2492 (1992) (reasoning that the jury could disbelieve defendant's uncorroborated and confused testimony" and that the jury "was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt"); *Padilla v. State*, --- S.W.3d ---, 2010 WL 3894785, *4 (Tex. Crim. App. Oct. 06, 2010) ("A rational trier of fact could also consider such untruthful statements by appellant, in connection with the other circumstances of the case, as affirmative evidence of appellant's guilt.") Viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found that the testimony of the witnesses and other evidence at trial were sufficient to establish the elements of murder beyond a reasonable doubt. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778; *see also* Tex. Penal Code Ann. § 19.02(b)(1)–(2) (listing elements of murder). Accordingly, we hold that the evidence is sufficient to support Winningham's conviction and overrule both of his points.

## IV. CONCLUSION

Having overruled both of Winningham's points, we affirm the trial court's judgment. Winningham's motion for setting bail is now moot; accordingly, the motion for bail is denied.

BILL MEIER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MEIER, JJ.

DAUPHINOT, J. filed a dissenting opinion.

PUBLISH

DELIVERED: October 21, 2010



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 2-07-389-CR

---

LESTER WINNINGHAM, JR.                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

## DISSENTING OPINION ON
## PETITIONS FOR DISCRETIONARY REVIEW

------------

On original submission, I joined the majority's holdings that the jury's verdict is clearly wrong because the evidentiary scale tips radically toward a negative finding that Appellant Lester Winningham, Jr. either intentionally or knowingly caused the death of Deborah Houchin; that the verdict is contrary to the law and the evidence; and that, based on the record before us, Appellant's conviction is clearly wrong and

manifestly unjust. I dissented from the majority's holding that the evidence is nonetheless sufficient to support Appellant's conviction under *Jackson v. Virginia*.[1]

More than twenty years ago, the Texas Court of Criminal Appeals announced,

> Adherence to the no evidence standard is now, and has been for the last decade, expressly forbidden by *Jackson*. It is no longer permissible to merely quote the *Jackson* standard and then to turn around and apply the *Thompson* no evidence standard as we have historically done. Therefore, we expressly overrule that part of *Combs* that relied upon the no evidence language quoted from *Banks* to denote the incorrect standard of review for sufficiency of the evidence three years after *Jackson*. To recapitulate, the test as delineated in *Jackson* requires us, as the reviewing court, to determine whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

> We must take each case and review the entire body of evidence to determine whether the State has proven beyond a reasonable doubt each and every element of the alleged crime and not just a plausible explanation of the crime.[2]

Clearly, although we view the evidence in the light most favorable to the prosecution, we are mandated to consider not exclusively the evidence supporting the verdict but the entire body of evidence to determine whether the State has proven each and every element of the offense beyond a reasonable doubt. It is not sufficient that the State provide just a plausible explanation of the crime.

---

[1] 443 U.S. 307, 99 S. Ct. 2781 (1979).

[2] *Butler v. State*, 769 S.W.2d 234, 239 (Tex. Crim. App. 1989) (citations and quotations omitted), *overruled on other grounds by Geesa v. State*, 820 S.W.2d 154, 161 (Tex. Crim. App. 1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570, 571 (Tex. Crim. App. 2000).

In the case now before this court, the State proved a plausible explanation of Houchin's murder, but I could not on original submission and cannot now glean from the record the evidence that would allow a rational trier of fact to conclude that the State proved each and every element of the murder by shooting with a firearm beyond a reasonable doubt.

Because this is a circumstantial evidence case, I believe we must look at the historic development of circumstantial evidence law in this state. For scores of years, our courts recognized that

> [a] conviction on circumstantial evidence cannot be sustained if the circumstances proven do not exclude every other reasonable hypothesis except that of the guilt of the accused; and proof amounting only to a strong suspicion or mere probability is insufficient.[3]

In 1983, the Texas Court of Criminal Appeals announced in *Hankins v. State* that juries should no longer be instructed on a separate circumstantial standard.[4] This shift was based on the fact that direct and circumstantial evidence are equally probative.[5] But after its decision in *Hankins*, the Texas Court of Criminal Appeals reiterated in *Carlsen*,

> By the nature of circumstantial evidence, in order to determine it rationally establishes guilt beyond a reasonable doubt, a process of elimination must be used. Illustrative is *Taylor v. State*. We there cited

---

[3] ... *Brock v. State*, 162 Tex. Crim. 339, 285 S.W.2d 745, 747 (Tex. Crim. App. 1956), *overruled by Geesa*, 820 S.W.2d at 161.

[4] ... 646 S.W.2d 191, 197 (Tex. Crim. App. 1983).

[5] ... *Id.* at 199.

the *Jackson* "standard for review;" in actually assessing the evidence, no method *other than* a process of eliminating the guilt of others under the evidence could be fashioned to effectively conclude the evidence rationally established Taylor's guilt beyond a reasonable doubt. Stated in the converse, if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding.[6]

The concurrence in *Carlsen* agreed with the majority that

[l]ogic dictates that if there is a "reasonable hypothes[i]s" other than the guilt of the accused, then it cannot be said that the guilt has been shown "beyond a reasonable doubt." In *Hankins v. State*, we recognized that direct and circumstantial evidence were to be treated with equal dignity. Thus, any effort to weave into the standard of appellate review any exception or difference or special treatment for one type of evidence or the other will fail for lack of logic.[7]

The Texas Court of Criminal Appeals continued to struggle with this issue and concluded on rehearing in *Freeman v. State*,

Moreover, scrutiny of the analysis suggested in the motions for rehearing (that the focus of our inquiry should be on "any evidence which could rationally support the verdict") reveals it to be functionally indistinguishable from that specifically rejected by the Supreme Court in *Jackson* as violative of the Fourteenth Amendment.

Finally, as the motions for rehearing persuasively argue, this Court's opinions have never held the circumstantial evidence *analysis* constitutes a different *standard for review* from that to be ultimately applied in direct evidence cases. If the State's evidence supports an inference other than a finding of the essential elements of the crime, then no trier of fact could *rationally* find the accused guilty *beyond a*

---

[6] *... Carlsen v. State,* 654 S.W.2d 444, 449 (Tex. Crim. App. 1983) (op. on reh'g) (citations omitted), *overruled by Geesa*, 820 S.W.2d at 161, *overruled on other grounds by Paulson*, 28 S.W.3d at 571.

[7] *... Id.* at 450 (McCormick, J., concurring).

*reasonable doubt*—and this is true irrespective of the character of the evidence.

> In sum, we are convinced there are no better analytical guidelines for assaying whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt in any given conviction had upon circumstantial evidence than those we currently employ.[8]

In a footnote, the opinion on rehearing acknowledged,

> It is true that some opinions of the Court have quoted language apparently originating from the pen of an author or editor of *Texas Jurisprudence* to the effect that in circumstantial evidence cases an appellate court will "review the evidence in light of *the presumption that the accused is innocent*[.]"

> Literally and technically inaccurate, the statement is revealed as a writer's attempt to convey the notion that the State's burden of adducing proof beyond a reasonable doubt is but a conceptual corollary of the presumption of innocence, and a failure to produce that evidentiary quantum operates to absolve the appellant.[9]

The Texas Court of Criminal Appeals then revisited the circumstantial evidence issue in *Geesa*, reversing its holding in the *Carlsen* line of cases but recognizing the problems the reversal created:

> As Judge Clinton succinctly put it, "the accused is stripped of the benefit of a charge on circumstantial evidence and then loses the protection of a definition on reasonable doubt."[10]

---

[8] ... *Freeman v. State*, 654 S.W.2d 450, 456–57 (Tex. Crim. App. 1983) (op. on reh'g) (citations and footnote omitted), *overruled by Geesa*, 820 S.W.2d at 161.

[9] ... *Id.* at 456 n.*.

[10] ... *Geesa*, 820 S.W.2d at 161.

The *Geesa* court attempted to correct the new problem by providing a definition of beyond a reasonable doubt,[11] but the *Geesa* instruction did not resolve the problem of an analytical construct for appellate review in a case where there was some evidence supporting the jury's verdict, but the verdict was clearly wrong. Rather than return to the old circumstantial evidence construct, the Texas Court of Criminal Appeals imported a factual sufficiency review in *Clewis v. State*.[12]

Giving lip service to the clear warning in *Jackson* that no appellate court should ever apply a no-evidence standard of review,[13] and having adopted a factual sufficiency review similar to the civil factual sufficiency review, appellate courts appear to have been willing to hold jury determinations legally sufficient if there was any evidence whatsoever to support the verdict. That is, appellate courts in practice were applying a no-evidence standard of legal sufficiency because they could fall back on a factual sufficiency review to overturn unsupported verdicts, yet give the State another chance to convict the accused. That is, even though the evidence to support conviction was insufficient, or, stated another way, the prosecution had failed to sustain its burden of proof, the appellate courts could remand the case for retrial by holding that the evidence was factually, as opposed to legally, insufficient.

---

[11] ... *Id.* at 162.

[12] ... 922 S.W.2d 126, 129 (Tex. Crim. App. 1996), *overruled by Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at *1, *14 (Tex. Crim. App. Oct. 6, 2010).

[13] ... 443 U.S. at 319, 99 S. Ct. at 2789.

In 2000, the Texas Court of Criminal Appeals reversed the *Geesa* requirement of a jury instruction on the definitions of "beyond a reasonable doubt" and "reasonable doubt."[14] But the factual sufficiency review survived until October 6, 2010, when the Texas Court of Criminal Appeals recognized in *Brooks* that the legal and factual sufficiency standards "have become essentially the same standard and that there is no meaningful distinction between them" and held that the *Jackson* standard is the only standard that appellate courts should apply in determining the sufficiency of the evidence to support an accused's conviction.[15]

If the prosecution fails to prove an essential element of the offense charged in the indictment and presented in the jury charge, the prosecution fails to sustain its burden under the *Jackson* standard. Further, if an eyewitness identifies A as the culprit, but a videotape shows that the offender is B, a jury who convicts A does not act rationally.[16] Under the old *Clewis* standard, reversal would be required because the evidence was factually insufficient, but the case would be remanded for a new

---

[14] *See Paulson*, 28 S.W.3d at 573.

[15] 2010 WL 3894613, at *1.

[16] *Id.* at *11.

trial.[17]  Neither *Jackson* nor double jeopardy protections permit retrial.[18]  Again, *Jackson* prohibits a no-evidence standard of review.

In the case now before this court, the majority previously determined that no rational trier of fact could have found that the prosecution proved beyond a reasonable doubt that Appellant committed each and every element of murder by shooting Houchin with a firearm.  Respectfully, I believe the majority applied a no-evidence standard in determining that the evidence was legally sufficient in its original opinion.  Now, the majority conscientiously remains consistent by holding the evidence sufficient.  I believe that this holding is at odds with an analysis of the facts under *Jackson*.

The *Brooks* court did not mandate that appellate courts abandon a factual analysis of the evidence.  Rather, the *Brooks* court reminded us that the *Jackson* standard is consistent with "constitutional and statutory mandates" that appellate courts review both "questions of law" and "questions of fact."[19]  To comply with *Jackson*, we must view all the evidence, but we must view that evidence in the light most favorable to the prosecution and determine whether the evidence is sufficient to permit a rational trier of fact to find the prosecution proved beyond a reasonable

[17] ... *See id.* at *10.

[18] ... *Id.* at *8 (citing *Greene v. Massey*, 437 U.S. 19, 24–25, 98 S. Ct. 2151, 2154–55 (1978); *Burks v. United States*, 437 U.S. 1, 16–18, 98 S. Ct. 2141, 2150–51 (1978)).

[19] ... *Id.* at *13.

8

doubt that the accused committed each and every element of the offense alleged. The majority previously held that the verdict shocks the conscience because it is clearly wrong and manifestly unjust. The justification for the conflict in the majority's previous conclusions is the change in vantage point formerly required by factual and legal sufficiency reviews. But a verdict that shocks the conscience and is clearly wrong and manifestly unjust cannot be salvaged by viewing the evidence, or absence thereof, from a different perspective.

In the first week of April 2004, Appellant moved in with Houchin in Arlington, Texas. Houchin and Appellant had disagreements, and Appellant moved out three times before he left the final time on April 15, 2005. Houchin changed the locks on her doors. While they lived together, but before April 15, 2005, they became engaged but broke off the engagement, and Houchin complained to others when she became angry with Appellant.

Bruce Tinch's very dramatic testimony of Houchin's visit to his house, which he described as the "apex of horrificness," recounted events that occurred in February 2005, well before April 15. In fact, after Houchin's dramatic, late-night visit to Tinch's house, Houchin and Appellant reconciled, and Appellant moved back into Houchin's house. Houchin's body was found July 22, 2005, more than three months after they broke up and Appellant moved out.

Other than disagreements in the office, the record does not reflect any personal interaction between Appellant and Houchin after April 15. In the office,

9

Houchin and Appellant argued over whether to hire a full-time or a part-time secretary, whether to fire an employee who had not locked the medication cabinet, and whether Appellant was doing his share of work in the office.

After their final breakup in April 2005, Houchin announced that she had posted her profile on an online dating service again and had gotten over 400 hits. Tinch testified that Appellant was not angry about Houchin's online dating and that he was actually indifferent about it. Indeed, Appellant had developed a relationship with another woman. Tinch also testified that Appellant was socially inept.

The last two people known to have seen Houchin alive were Robert Mims, a coworker, and Amy Tinch, Bruce Tinch's wife. Houchin and Appellant had argued at work on the evening of July 21, 2005, a Thursday, and Mims and Amy had gone with Houchin to her car after Appellant left. Mims described the argument as one like a divorced couple would have, with each party pushing the other's buttons and saying that the other needed counseling. Mims said that the argument seemed more hostile than he had been expecting, but was just verbal sparring, and neither Appellant nor Houchin had made any threats. Mims testified that he had told Houchin that, over the years, "some chaos in the office setting . . . seem[ed] to follow [her]." Mims testified that he left Houchin around 10:50 p.m.

The record reflects speculation that Appellant could have murdered Houchin, but what is the evidence, circumstantial or otherwise, that he actually murdered Houchin? I know that we are not supposed to consider what evidence is missing in

10

determining that the evidence is insufficient,[20] but surely there must be some evidence beyond suspicion and speculation to convict someone of murder.

The State argued that a receipt showing that a rope and a tarp were purchased at an Academy store in Arlington on July 2, 2005 was found at the scene of the fire in Muenster. The State argued that this receipt was significant because Appellant lived less than ten miles from that store. But there is no evidence that Appellant is the person who made the purchase. There is no evidence that Houchin did not make the purchase. She also lived in Arlington, and their office was in Arlington. The total land area of Arlington is 99.5 square miles.[21] Where in Arlington could any of its approximately 370,450 inhabitants live without being within ten miles of the Academy store?[22] Is it the State's theory that on July 2, Appellant planned to kill Houchin in her home on July 21 or 22 and was so well organized that he purchased the tarp and rope in preparation, yet he was so disorganized that he left the receipt at the scene of the fire? He prepared so well that on July 21 or 22 he took the tarp and the rope to her home, as well as the receipt that he managed to

---

[20] *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("Our review of 'all of the evidence' includes evidence that was properly and improperly *admitted*.") (emphasis added).

[21] City Facts and Figures: Get to Know Our City, http://www.arlingtontx.gov/cityfacts.html (last visited October 19, 2010).

[22] *See id.*

11

leave at the scene in Muenster, yet left the bag that he carried them in at home for the police to find?

The majority assumes that Houchin was wrapped in a blue tarp that was tied together with rope before she was put into the trunk of Appellant's car. But there is no evidence of that. The theory was created by the prosecution to explain blue marks that appear on the bumper of Appellant's car, but not on the edge of the trunk, the gasket, or anywhere inside the trunk. The theory was also created to explain how there could be blood smears on the floor inside Houchin's house and on her garage floor where police investigators concluded the body had been dragged, but no such blood smears or hairs from Houchin's body anywhere inside or outside of Appellant's car. Although Pat Eddings, senior trace analyst with the Tarrant County Medical Examiner's Office, testified that the blue fibers appeared to have been put on the bumper by force, no one could testify how much force would have been required. She admitted that hundreds of thousands of items would leave the same blue marks as the tarp. For example, she could not exclude plastic brushes on a car wash.

So what was the evidence that Appellant intentionally or knowingly caused the death of Houchin by shooting her with a firearm?

- They had been engaged and lived together. When she was angry, Houchin told people to tell the police to look at Appellant if anything happened to her.

- Appellant and Houchin had argued at the office on the last night that she was seen. The argument was over whether to write up an employee who had failed to lock the medication cabinet.

- Appellant had some empty Academy bags in his house. He had some natural fiber rope, but it was not the same kind of rope as that contained in the bag found in Muenster at the fire site.

- Appellant made a call from his cell phone in Arlington, where he lived and worked, on the night that police suspect Houchin was killed.

- Appellant did not turn in his day sheets for billing on Thursday, as was his custom, but waited until Sunday.

- Appellant called the receptionist on Friday morning to say that he would arrive at work late, although he testified that he made no such call, his cell phone records reflected no such call, and he arrived on time.

- Hillman testified that there were two trunk liners—a permanent liner and a removable plastic liner that lies on top of the permanent-cloth liner. A spot of Houchin's blood was found on the permanent liner in Appellant's car's trunk, although there was no way to tell how long it had been there and, presumably, it was underneath the plastic liner. Blue marks appeared on the bumper of Appellant's car.

- The police testified that there was no forced entry into Houchin's house.

- The police testified that an opened bag of dog food in the kitchen proved that the killer was concerned about the welfare of Houchin's dogs, so it must have been Appellant who killed Houchin because he must have known the dogs.

- Appellant did not seem sorry enough that Houchin was dead.

- Tinch claimed that Appellant called Houchin's sister on the weekend to speak of Houchin's death before the body was identified, although Houchin's sister and telephone records showed that he called only after Houchin's body had been identified.

- Appellant got an expedited passport after Houchin was killed but before her body was identified, bought a round-trip ticket to Germany, withdrew $20,000 from his bank account, paid his electric bill, paid his health club bill, and left

13

money in his bank account. After Houchin's body was identified, he contacted the police to tell them that he was going to Germany.

The State argued that a circumstance supporting Appellant's conviction was the fact that he had planned to go to Germany but did not go and instead attended Houchin's funeral. I note that Mims, one of the last two people to see Houchin alive, did leave the country, however, and did not attend Houchin's funeral.

The medical examiner determined that Houchin had been shot three times. A projectile with Houchin's blood on it was found in her house. It was not fired from her gun. No evidence connects Appellant to any firearm. Nothing in the record indicates that Appellant owned a firearm, had ever owned or possessed a firearm, or had access to a firearm. Nothing places Appellant in or near Houchin's house after she left the office Thursday night.

Is this sufficient evidence to justify a rational jury's concluding that the State had proved each and every element of the offense of murder beyond a reasonable doubt under the *Jackson* standard?[23] That is, looking at the evidence in the light most favorable to the prosecution, is the evidence sufficient to prove to a rational jury beyond a reasonable doubt that Appellant intentionally or knowingly caused the death of Houchin by shooting her with a firearm? The majority believes it is. I cannot agree.

---

[23] *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

14

A rational jury must consider the evidence as a whole, and not just the evidence that may possibly imply guilt. That is, a rational jury considers all the evidence, and even though a reviewing court must view the evidence in the light most favorable to the prosecution, we must nevertheless view all the evidence, not just that evidence favorable to the prosecution.[24]

For example, Tinch testified that Appellant called Houchin's sister to tell her of Houchin's death sometime during the weekend after the murder but before her body was identified. That could be considered evidence supporting the conviction. But Houchin's sister testified that Appellant called her after the body was identified, and the telephone records support her testimony. Under *Brooks*, the jury could not rationally ignore the telephone records in favor of Tinch's testimony.[25]

What about evidence that is mere speculation or supposition? The police assumed, speculated, or supposed that the killer, rather than Houchin or the dogs themselves, ripped open a bag of dog food and that this meant that whoever killed Houchin cared about the dogs, and therefore must have known them, and therefore must have lived in the house with them, and therefore must have been Appellant. Do we assume that a rational jury gave weight to this evidence, which is unsupported by anything other than speculation?

---

[24] ... *Id.* at 319, 99 S. Ct. at 2789.

[25] ... *See* 2010 WL 3894613, at *11.

15

On the last night that she was seen by coworkers, Houchin had plans to meet for the first time with someone she had met through an online dating service. He said that she had canceled the meeting because there was something she thought she had taken care of that she had to do that night. The record does not reflect that the police found an e-mail or a record of a telephone call supporting his claim that she had canceled their meeting. Nothing in the record suggests that Houchin planned to meet with Appellant that night. Houchin did not leave the office until 10:50 p.m. Was the matter that she had previously thought resolved the reason that she stayed at work so late? If Houchin did indeed cancel her meeting with the man she met online, nothing in the record suggests that the unresolved issue involved Appellant. Indeed, a beer can and a cigarette butt were found beside the driveway. The police never tested them for fingerprints or DNA. Nor was there any evidence in the record that Appellant smoked.

The record also reflects that when Texas Ranger Tracy Murphree applied for search warrants and the arrest warrant for Appellant, Murphree stated that Appellant had made a cell call on the night that Houchin disappeared and that the call was made from a location "in close proximity to her house." At trial, however, Murphree admitted that he could only tell that the call had been made somewhere in Arlington, but not which cell tower handled the call or how close to Houchin's house the cell phone was when the call was made. Of course, Appellant lived and worked in Arlington, and records would reflect that any calls he made from his home or office

16

were made from Arlington. The record also reflects that Appellant called Amy Jaggers, his girlfriend at the time, on the night that Houchin was killed.

The police further concluded that the killer had to be someone Houchin knew because there was no forced entry. What is the evidence that the doors or windows were locked before the shooting? There is no evidence that Appellant had a key because Houchin had changed her locks after he moved out. A broken window had been boarded over, but the police entered the home through it. What is the evidence that no one else previously entered the home through the same broken window? Police discovered blood on or near Houchin's computer, indicating that she was at or near her computer at some point during the murder. Was she working on her computer when she was talking to her murderer, or was she surprised while she was working on her computer?

The majority and the prosecution rely on the fact that the body appeared to have been dragged to the entrance of the garage, where the blood smears stop, suggesting that Appellant's car was waiting in the garage. But photographs show Houchin's car parked in the center of the garage, leaving no room for any other car. Her car keys were in plain view in the house. There is no evidence that the police ever examined her car to determine whether it had been used to transport her body. Was Houchin's car used to transport her body, or did the murderer carry her body outside the garage to a waiting car? It seems suspect that the blood trail ends in Houchin's garage, but there is no evidence that Houchin's car was ever moved so

17

that another vehicle, ostensibly Appellant's, could have been used to transport Houchin's body, and no evidence that Houchin's car was so used.

If the weight of Houchin's body was sufficient to cause the blue tarp to smear onto the bumper, why are there no blue smears on the plastic lining inside Appellant's car? What is the evidence that Appellant and no one else purchased a blue tarp? What is the evidence that the murderer bought the tarp rather than merely using whatever was available to dispose of the body?

Indeed, if the killer had driven Appellant's car and if there was no indication that he ever cleaned the interior of his car, there would be some evidence. The State theorized that the killer dragged the bleeding body through the house, based on the blood evidence in the house, yet there was no blood anywhere in the passenger compartment of Appellant's car. The police found a footprint in dog feces in the house, a footprint which the record does not show any attempt by the police to match. Yet no one testified that the police found any evidence of feces in Appellant's car. And even though the State's theory was that Houchin was killed in her home, there was also no evidence that the killer left personal items behind or attempted to clean himself at Houchin's house. Finally, even though the State depended largely on the presence of a blue material found in scratches on the bumper of Appellant's car, there was no blue material inside his trunk, nor was any evidence of a blue tarp-like material found in Houchin's house or garage. The person who moved the body either dragged it across the garage floor or carried it to

18

whatever car was used to transport it. Where are the blue smears from dragging the tarp-wrapped body across the garage floor? Why is there no blood transfer anywhere inside the passenger compartment of Appellant's car?

Additionally, regardless of what time Appellant arrived at work on Friday, there is no evidence that he looked disheveled, smelled of accelerant, or had blood on him. No evidence of bloody clothing or instrumentalities of the crime—other than potentially the Academy bag—was found in his car or at his apartment. Furthermore, despite testimony that Appellant called Houchin's sister over the weekend, phone records objectively demonstrate that he did not call Houchin's sister until Tuesday—after everyone at the clinic had learned of Houchin's murder.

The majority states that the passenger compartment of Appellant's car was messy but that the trunk was "pristine," containing blood and dog hairs and brown human hairs. Although the blood was underneath the plastic liner, it is unclear where the hairs were located in this "pristine" environment. The State proved that Appellant's car could plausibly have been used to transport Houchin's body somewhere. The State also proved that Houchin could have bled onto the trunk liner underneath the plastic liner at any time in the previous months.

But Appellant was neither charged with nor convicted of tampering with evidence. He was not convicted as a party to the offense of murder. He was charged and convicted of intentionally or knowingly committing murder by intentionally or knowingly firing a firearm. There is no evidence to suggest who fired

19

the shots that killed Houchin, that the person who killed her was the person who transported the body, that Appellant's car was in Muenster on the day that the body was burned, that Appellant's car had transported any accelerant or that Appellant had handled any accelerant, that Appellant ever possessed or fired a firearm, or that Appellant had any connection to the burning of Houchin's body.

Murphree testified that the killer knew and was concerned about the dogs and must have torn open the dog food bag. This conclusion is no more than speculation. In *Winfrey v. State*,[26] the evidence of guilt was not that Winfrey and the dog had a prior relationship but that dogs alerted to Winfrey's scent allegedly present on the clothing worn by the murder victim at his death. The Texas Court of Criminal Appeals held that although dog-scent identification evidence may raise a strong suspicion of a suspect's guilt, standing alone it is insufficient to establish a person's guilt beyond a reasonable doubt.[27] The Texas Court of Criminal Appeals thereby cast grave doubt on the reliability of such testimony.[28]

The *Jackson* court made clear that we are not to use a "no evidence" standard in determining the sufficiency of the evidence to support a conviction.[29] The *Jackson* court also made clear that the "no evidence" standard is inadequate to protect

---

[26] ... No. PD-987-09, 2010 WL 3656064 (Tex. Crim. App. Sept. 22, 2010).

[27] ... *Id.* at *5.

[28] ... *See id.*

[29] ... 443 U.S. at 320, 99 S. Ct. at 2789.

against misapplication of the constitutional standard of reasonable doubt: "[A] mere modicum of evidence may satisfy a 'no evidence' standard" because any evidence that is relevant and has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence could be deemed a mere modicum, but "it could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt."[30]

Respectfully, reviewing the entire body of evidence, I would hold that the State has not proved beyond a reasonable doubt each and every element of the murder of Houchin but merely a plausible explanation of the crime. When this evidence is viewed in the light most favorable to the prosecution, no rational trier of fact could have found, from the evidence as opposed to mere conjecture and speculation, the essential elements of the crime beyond a reasonable doubt under the test mandated by *Jackson*. I therefore respectfully dissent from the majority's holding that the evidence is sufficient to support Appellant's conviction under the *Jackson* standard.

LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: October 21, 2010

---

[30] *Id.*, 99 S. Ct. at 2789–90.

21